IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JOSEPH THOMAS WILLIAMS,           )
                                  )
                  Plaintiff,      )
                                  )
        v.                        )
                                  )
GUILFORD TECHNICAL COMMUNITY      )
COLLEGE BOARD OF TRUSTEES,        )        1:14cv843
ANGELA DAWN TEVEPAUGH, DR.        )
RANDY PARKER, BEVERLY NIPPER,     )
RAE MARIE SMITH, JEAN JACKSON,    )
ELIZABETH CLODFELTER, NATASHA     )
POWELL, AARON SMITH, ADRIENNE     )
FRIDDLE, MITCHELL JOHNSON,        )
                                  )
                  Defendants.     )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

Before the court is Defendants' motion to dismiss all of
Plaintiff Joseph Williams' claims in this employment
discrimination action. (Doc. 20.) For the reasons set forth
below, the motion will be granted in part and denied in part.

I.    **BACKGROUND**

The allegations in Williams' *pro se* complaint, construed in
the light most favorable to him, show the following.

Williams is an African-American man in his sixties. From
August 2003 to March 2014, he was employed by Guilford Technical
Community College ("GTCC") as a security officer with the campus
police department, holding the rank of sergeant since 2013. (Doc.
1 at 3-4.) His supervisor was Chief Dawn Tevepaugh, a white woman

in her forties. (Id. at 4.) At some point, Chief Tevepaugh limited Williams' supervisory authority over Corporal Elizabeth Clodfelter (a white woman in her thirties), and Officer Natasha Powell (also a white woman in her thirties). (Id. at 4.) These officers were made to report directly to Chief Tevepaugh, bypassing Williams in the chain of command. (Id.) Williams does not explain why this occurred, or what reason was given for it.

Many of Williams' allegations involve these three female officers. Williams alleges that, on three occasions, he was called into Chief Tevepaugh's office to discuss "false rumors" being disseminated about him; Corporal Clodfelter was also present during these discussions. (Id.) Williams also complains that Corporal Clodfelter and Officer Powell have been sent to receive training on campus crimes but he has not, though he is required to know the rules taught at that training. (Id.) Williams does not allege that he needs such training to perform his job or that he wished to attend the training.

On August 9, 2013, Williams was called into a meeting with Chief Tevepaugh and Adrienne Friddle, a human resources employee. (Id.) At the meeting, Williams was "accused of sharing an officer[']s confidential information about a matter." (Id.) Williams denied the accusation, and, at some point, the aggrieved officer wrote a statement saying that Williams did not divulge confidential information. (Id.) Williams believes that the

2

complaint against him was actually made by Officer Powell. (Id.) This situation apparently resulted in a reprimand for Williams, but he does not explain the stated basis for his discipline.

Williams appealed the reprimand. In his appeal, he requested an investigation into "the discrimination [he] was subjected to" by Chief Tevepaugh and threatened to file an Equal Employment Opportunity Commission ("EEOC") complaint if GTCC did not investigate. (Id.) Friddle and another employee then conducted an investigation and interviewed all of the campus police officers. (Id.) No outcome of the investigation was reported to Williams. (Id.)

On October 5, 2013, Williams sent correspondence to the EEOC about filing a charge of discrimination against GTCC. (Id. at 5.) He believes the EEOC then notified GTCC of this communication. (Id.)

On October 15, 2013, Williams was again called into a meeting with Friddle and Chief Tevepaugh, where he received a second written reprimand and a notice of probation. (Id.) Williams was placed on probation for a year, with an evaluation to occur every ninety days, and with no possibility of a raise during the probationary period. (Id.) Williams does not explain why he was disciplined or whether he engaged in any misconduct.

At some point during October, Williams and Officer Powell got into a dispute. Williams told her to go through the "proper chain

3

of command" to change her work schedule. (Id. at 6.) She responded by becoming "belligerent" and complaining to Chief Tevepaugh, who directed Officer Powell to take her complaint to human resources. (Id.)

On October 28, 2013, Williams filed an EEOC charge of race, age, and sex discrimination against GTCC. (Id. at 3.) He alleges that, after filing the charge, Chief Tevepaugh "continued" to harass him and scrutinize his work based on "third party hearsay or rumors" by Corporal Clodfelter, Officer Powell, or Sergeant Aaron Smith, a white male in his thirties. (Id. at 5.) Williams met with two GTCC administrators about the treatment he received from Chief Tevepaugh, but they allegedly took no action to stop her. (Id.)

In March 2014, a series of events led to Williams' forced retirement. On March 21, the Guilford County Sheriff's Department "911 Operation" initiated "a routine legal paper call for service." (Id. at 6.) Williams responded to the call, assisted by Sergeant Raymond Reese, a black male in his fifties, and Sergeant Ron Johnson, a white male in his fifties. (Id.) At some point after the call, Chief Tevepaugh "questioned the way" the three men responded and began an investigation. (Id.) In the meantime, she and Friddle suspended Williams. (Id.) Williams does not explain why Tevepaugh began her investigation, nor does he say whether Sergeants Reese and Johnson were also suspended.

4

On March 31, 2014, following the investigation, Williams was called into a meeting with Chief Tevepaugh and Jackson, who gave Williams the option of termination or retirement. (Id.) He chose to retire. (Id.) On April 21, 2014, Williams filed a second EEOC charge of retaliation against GTCC. (Id. at 3.)

Williams makes several other allegations lacking chronological context. He notes that he "adequately and completely" performed his duties while employed at GTCC. (Id. at 6.) He alleges that when he began interviewing a white female student who had made a complaint against one of Williams' black officers, Chief Tevepaugh took the investigation away from Williams and gave it to Sergeant Smith (who, as noted, is white). (Id.) He further complains that Chief Tevepaugh installed a "hidden video camera" in her office, which apparently faced Williams' office, and recorded who entered and left his office; she did not monitor other officers this way. (Id.) Williams alleges that Corporal Clodfelter (Williams' subordinate) on several occasions asked Williams, in Chief Tevepaugh's presence, when he was going to retire because she wanted his position. (Id. at 5.) Finally, Williams alleges that, during the EEOC's investigation, "it was discovered that Chief Tevepaugh had been untruthful in many of her daily activities" and "was given the opportunity to resign on May 28, 2014." (Id. at 6.) Williams does not allege that Chief Tevepaugh has in fact resigned or been

terminated. In fact, she appears to still serve as GTCC's chief of campus police, given that Williams has sued her in her official capacity as chief of campus police. (Id. at 3.)

Williams received notice of his right to sue from the EEOC on September 14, 2014. (Id.) On October 6, 2014, Williams filed his *pro se* complaint in this court, bringing claims of race, sex, and age discrimination, as well as retaliation, seeking compensatory and punitive damages under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 et seq. Williams brings his claims against the GTCC Board of Trustees ("GTCC Board" or "Board"); Randy Parker, president of GTCC, in his official capacity; and nine other GTCC employees, in their official and individual capacities. (Id. at 2–3.)

Defendants move to dismiss all Williams' claims for failure to state a claim, and the GTCC Board moves to dismiss for insufficiency of process and insufficiency of service of process. (Doc. 20.) Williams filed two responses, in violation of the Local Rules, though both have been considered. (Docs. 23, 24.) Defendants replied. (Doc. 25.) Defendants also moved to stay discovery pending resolution of their motion to dismiss, which the court previously granted. (Docs. 26, 31.) Defendants' motion is now ripe for consideration.

6

## II. ANALYSIS

### A. Service of Process

Defendant GTCC Board argues that it should be dismissed because of insufficiency of process and insufficiency of service of process.[1] (Doc. 21 at 18.) Under Rule 4(j) of the Federal Rules of Civil Procedure, service of process on a State, municipality, or "any other state-created governmental organization that is subject to suit" must be served by (1) delivery to the organization's "chief executive officer," or (2) according to "that state's law for serving a summons or like process on such a defendant." Fed. R. Civ. P. 4(j)(2).

Williams attempted to serve the GTCC Board, a separately named Defendant, by registered mail. (Doc. 5.) The delivery was signed for by Corey Harris, who checked the "agent" (as opposed to "addressee") box of the certified mail receipt. (Id.) According to Defendants, Harris is employed by GTCC merely as a shipping and receiving clerk and not as a registered agent or attorney-in-fact authorized to accept service on behalf of the GTCC Board. (Doc. 21 at 19; Doc. 20-1.) Therefore, Defendants argue, this service was invalid.

---

[1] Defendants' contention of insufficient process goes wholly unsupported in their briefing. Consequently, the court deems this defense abandoned. Cf. Edwards v. City of Goldsboro, 178 F.3d 231, 241 n.6 (4th Cir. 1999) (deeming abandoned arguments unsupported by a litigant's brief); L.R. 7.2(a)(4) (requiring litigants to support their arguments with "authorities relied upon).

7

Service on the GTCC Board via Harris was deficient. Because process was not served on the Board's "chief executive officer," Williams was required to comply with Rule 4(j)(2)(B), which merely incorporates North Carolina's rules for service. Under Rule 4(j)(5)(c) of the North Carolina Rules of Civil Procedure, service on the Board could have been accomplished in one of four possible ways. The method nearest to that used by Williams was method three, mailing a copy of the process by "registered or certified mail, return receipt requested, addressed to" an officer or director of the GTCC Board, or an agent or attorney-in-fact authorized to accept service on the Board's behalf. Williams sent the Board a copy of the complaint and summons through registered mail, return receipt requested. (Doc. 5.) However, service was deficient because the mailing was addressed to the Board generally, rather than a member of the Board. (See id.) North Carolina law requires strict compliance with Rule 4(j). Crabtree v. City of Durham, 526 S.E.2d 503, 504–05 (N.C. Ct. App. 2000).

This deficiency is not fatal, however, because Williams properly served GTCC's chief executive officer, President Parker, by registered mail with a summons and complaint stating claims against him in his official capacity. (Doc. 6.) See Fed. R. Civ. P. 4(j)(2). Parker signed for delivery of the process. (Id.) No Defendant argues that service on Parker was ineffective or that he

was not an appropriate person to be served on behalf of GTCC.[2]  See
Kentucky v. Graham, 473 U.S. 159, 166-67 (1985) ("As long as the
government entity receives notice and an opportunity to respond,
an official-capacity suit is, in all respects other than name, to
be treated as a suit against the entity.").

Therefore, the motion of the GTCC Board to dismiss the action
as against it will be granted, but this deficiency does not itself
warrant dismissal of the entire case.

**B.    Failure to State a Claim**

Defendants also move to dismiss the complaint for failure to
state a claim upon which relief can be granted pursuant to Federal
Rule of Civil Procedure 12(b)(6).

Under Rule 12(b)(6), "a complaint must contain sufficient
factual matter . . . to 'state a claim to relief that is plausible
on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)
(quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A
claim is plausible "when the plaintiff pleads factual content that
allows the court to draw the reasonable inference that the
defendant is liable for the misconduct alleged."  Id. (quoting
Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007)).  A 12(b)(6)
motion to dismiss "challenges the legal sufficiency of a complaint
considered with the assumption that the facts alleged are true."

---

[2]  Williams argues that Parker is GTCC's chief executive officer (Doc.
24 at 9), a claim not denied by the Defendants.

*Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009) (internal citations omitted).

In his filings subsequent to the Defendants' motion to dismiss, Williams has referred to additional facts against Defendants. (*See, e.g.*, Doc. 24 at 9–17.) Because these allegations are not included in the complaint, they will not be considered for purposes of Defendants' Rule 12(b)(6) motion. *See Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004).

The court recognizes that Williams appears *pro se*. "While a *pro se* litigant's pleadings are liberally construed, *Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978), a *pro se* complaint must still contain sufficient facts 'to raise a right to relief above the speculative level' and 'state a claim to relief that is plausible on its face.'" *Adams v. Sw. Va. Reg'l Jail Auth.*, 524 F. App'x 899, 900 (4th Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).[3] This liberal construction, however, does not permit the court to become an advocate for a *pro se* litigant or to rewrite his complaint. *Laber v. Harvey*, 438 F.3d 404, 413 n.3 (4th Cir. 2006); *Gordon*, 574 F.2d at 1152–53.

---

[3] Unpublished opinions of the Fourth Circuit are not precedential. *See Collins v. Pond Creek Mining Co.*, 468 F.3d 213, 219 (4th Cir. 2006) (recognizing that "we ordinarily do not accord precedential value to our unpublished decisions" and that such decisions "are entitled only to the weight they generate by the persuasiveness of their reasoning" (citation omitted)).

### 1. Claims Against the Individual Defendants

Williams has brought claims against Parker in his official capacity only, as well as claims against the other individually named Defendants in both their official and personal capacities, all of whom are collectively referred to as the "Individual Defendants." (Doc. 1 at 2–3.) The Individual Defendants argue that all personal capacity claims against them should be dismissed because Title VII and the ADEA do not create individual liability. They are correct, and those claims will be dismissed. Lissau v. S. Food Serv., Inc., 159 F.3d 177, 180–81 (4th Cir. 1998).

The Individual Defendants also argue that the official capacity claims should be dismissed because they are "duplicative of claims against GTCC," citing Kentucky v. Graham, 473 U.S. 159 (1985). (Doc. 21 at 9.) In Graham, the Supreme Court noted that official capacity claims are just another way of pleading claims against the entity of which the individual is an officer or employee. Id. at 166. So, "[a]s long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." Id. at 167. Here, GTCC is subject to suit because Parker was properly sued in his official capacity. Therefore, the other Individual Defendants' official capacity claims are duplicative and will be dismissed.

### 2. Punitive Damages

Williams seeks punitive damages against all Defendants. (Doc. 1 at 7.) Because the individual liability claims have been dismissed, the issue is whether GTCC can be liable for punitive damages under Title VII or the ADEA.

As for Williams' age discrimination claim, the ADEA does not provide for punitive damages. <u>Fariss v. Lynchburg Foundry</u>, 769 F.2d 958, 967 n.11 (4th Cir. 1985); 29 U.S.C. § 626.

As for Williams' Title VII claims, Defendants argue that "municipal corporations" are immune from punitive damages. For claims under Title VII, punitive damages are not recoverable against "a government, government agency or political subdivision." 42 U.S.C. § 1981a(b)(1). GTCC is an arm of the State of North Carolina because the State funds GTCC and is ultimately liable for any judgment entered against GTCC. <u>Blackburn v. Trustees of Guilford Technical Cmty. Coll.</u>, 822 F. Supp. 2d 539, 543 (M.D.N.C. 2011). Being a governmental agency, GTCC is not liable for punitive damages under Title VII.

Therefore, Williams' claims for punitive damages will be dismissed.

### 3. Plausibility of Claims

To survive a motion to dismiss for failure to state a claim, a plaintiff must allege facts in his complaint to state a claim for relief under Title VII and ADEA that is "plausible on its

12

face." <u>McCleary-Evans v. Md. Dep't of Transp.</u>, 780 F.3d 582, 585 (4th Cir. 2015). With regard to his race and sex discrimination claims, Williams must allege facts plausibly showing that GTCC "discriminated against [him] with respect to his compensation, terms, conditions, or privileges of employment, because of [his] race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); <u>McCleary-Evans</u>, 780 F.3d at 585. The ADEA has a parallel prohibition. 29 U.S.C. § 623(a)(1). These statutes are not general prohibitions on "bad acts," however, <u>Bonds v. Leavitt</u>, 629 F.3d 369, 384 (4th Cir. 2011), and the "crucial issue" is "an unlawfully discriminatory motive for a defendant's conduct, not the wisdom or folly of its business judgment," <u>Jiminez v. Mary Washington Coll.</u>, 57 F.3d 369, 383 (4th Cir. 1995).

With this in mind, and construing Williams' *pro se* complaint liberally, the court will determine whether the facts alleged render Williams' claims of invidious discrimination not merely "conceivable" but "plausible." <u>Iqbal</u>, 556 U.S. at 680 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).

### a. Hostile Work Environment

Hostile work environment claims relate to the "terms, conditions, or privileges" of employment. <u>Hartsell v. Duplex Products, Inc.</u>, 123 F.3d 766, 772 (4th Cir. 1997). To state a claim for hostile work environment, Williams must allege facts making the following elements plausible: (1) he experienced

13

unwelcome harassment; (2) the harassment was based on his sex, race, or age; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on GTCC. <u>Bass v. E.I. DuPont de Nemours & Co.</u>, 324 F.3d 761, 765 (4th Cir. 2003).

Although Williams has filed two responses to Defendants' motion to dismiss, they are virtually unresponsive to Defendants' arguments. He suggests that when Chief Tevepaugh discussed allegations made against him in the presence of Corporal Clodfelter, this "created a hostile work environment." (Doc. 1 at 4.) More plausibly, Corporal Clodfelter was there because she made the complaint or was related to it, given the hostility between Williams and Clodfelter. But even assuming that Clodfelter's presence was unrelated to the complaints Chief Tevepaugh was investigating, Williams has given no basis for finding this behavior inappropriate, or based on Williams' race, sex, or age. Williams does not allege that he asked Corporal Clodfelter to leave, or that he asked Chief Tevepaugh to dismiss her.

It is unclear what other conduct in Williams' complaint he believes supports a hostile work environment claim. Most incidents Williams complains of have no connection to his race, age, or sex. Such insufficient incidents include Chief Tevepaugh permitting

14

Powell and Clodfelter to circumvent the chain of command; Chief Tevepaugh's "closed door" meetings with Powell, Clodfelter, and Smith; and Chief Tevepaugh's scrutiny of Williams' leadership decisions when he was on probation. None of these allegations is evidence to support a plausible claim of unwelcome harassment on the basis of Williams' race, age, or sex.

Williams also complains of an event where his supervisory authority was overridden by Chief Tevepaugh when a white female student had made an allegation against one of Williams' black officers. (Id. at 6.) Williams began interviewing the student, but Chief Tevepaugh took the investigation away from him and gave it to Sergeant Smith, who is white. (Id.) Williams does not give any further explanation of the incident, but implies that it constituted racial discrimination. Even assuming race was involved in an improper way, and that Chief Tevepaugh's conduct constituted "unwelcome harassment," Williams has not shown that the conduct "was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere." Bass, 324 F.3d at 765.

Williams also alleges an age-related incident with Corporal Clodfelter. Clodfelter allegedly asked Williams, in Chief Tevepaugh's presence, when he was going to retire because she wanted to be promoted to his position. (Doc. 1 at 5.) This allegedly occurred on multiple occasions. But even if the court

15

found this to be unwelcome harassment on the basis of age, the conduct, again, would not plausibly clear the "high bar" of the severe or pervasive test. EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 315 (4th Cir. 2008). Compare Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 333 (4th Cir. 2003) (finding that male coworkers' almost daily conduct, which included repeatedly simulating sex with a mannequin, directing vulgar and sexually explicit songs at plaintiff, and presenting her with graphic pornography, were sufficiently severe or pervasive to create an abusive work environment) with Buchhagen v. ICF Int'l, Inc., 545 F. App'x 217, 219 (4th Cir. 2013) (holding that supervisor "mockingly" yelling at plaintiff, making "snide comments" to plaintiff, "playing favorites with employees," "repeatedly harping" on plaintiff's mistake, and "unfairly scrutinizing and criticizing" plaintiff failed to state hostile work environment claim), and Hawkins v. PepsiCo, Inc., 203 F.3d 274, 276 (4th Cir. 2000) (holding that complaint premised on "a routine difference of opinion and personality conflict with her supervisor" insufficiently stated actionable facts for a hostile work environment claim), and Hoffman v. Baltimore Police Dep't, 379 F. Supp. 2d 778, 791 (D. Md. 2005) (finding plaintiff's allegations that he was forced to relocate his office numerous times, that his work was subjected to "intense scrutiny," that he was given an increased case load and forced to work longer uncompensated hours,

16

and that his job title was downgraded fell short of stating a hostile work environment claim).

Even considering all of these allegations in the aggregate, they "merely tell a story of a workplace dispute . . . . They do not describe the type of severe or pervasive gender, race, or age based activity necessary to state a hostile work environment claim." Bass, 324 F.3d at 765; accord Averette v. Diasorin, Inc., No. 3:11CV203, 2011 WL 3667218, at *3 (W.D.N.C. 2011) ("All of Plaintiff's allegations of 'harassment' do nothing more than establish that she did not get along with her co-workers . . . .").

Williams' allegations regarding a hidden video camera are likewise insufficient to make out a hostile work environment claim. Williams has alleged, without reference to any particular time in his narrative, that Chief Tevepaugh placed a hidden video camera with audio recording outside her office facing Williams' office and "continually recorded me and anyone entering and leaving my office with video and audio." (Doc. 1 at 6.) Williams alleges that "no other officer was subjected to this type of treatment." (Id.) The surveillance alleged is not linked to Williams' sex, race, or age. See Manson v. Gen. Motors Corp., 66 F. App'x 28, 33 (7th Cir. 2003) ("And, given that the persons 'monitoring' him were his supervisors, they were in all likelihood just doing their job. The record fails to disclose any evidence that their motivation for supervising Manson in such manner was related to

17

his race.") Video surveillance of employees is ordinarily insufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere. See _Smith v. Niles Twp. High Sch. Dist. 219_, No. 03-C-2984, 2006 WL 756071, at *7 (N.D. Ill. Mar. 22, 2006) (collecting cases and noting, "Like other courts, this Court declines to find a hostile work environment founded on an allegation that a supervisor monitored or surveilled an employee's activities."); _Johnson v. Gestamp Alabama, LLC_, 946 F. Supp. 2d 1180, 1206 (N.D. Ala. 2013) ("The only frequent conduct — Plaintiff's constant surveillance — was not severe enough to interfere with Plaintiff's work performance. Under these facts, a reasonable person could not find the kind of severe or pervasive conduct necessary to bring a hostile work environment claim." (citation omitted)); _Hamilton v. Mo. Dep't of Corr._, No. 08-3277-CV-S-MJW, 2010 WL 2653277, at *5 (W.D. Mo. June 23, 2010); _Galdamez v. DHL Air Exp._, No. 12-20492-CIV, 2013 WL 4494123, at *10 (S.D. Fla. Aug. 19, 2013) ("Taking the statements of constant surveillance, yelling and disrespectful language at face value, Galdamez offers no probative evidence to find that St. George's conduct was so objectively severe that it altered the terms of her employment."), _aff'd sub nom._ _Galdamez v. DHL Air Exp. USA_, 578 F. App'x 887 (11th Cir. 2014).

Therefore, Williams' hostile work environment claims will be dismissed.

## b. Wrongful Discharge

Williams appears to bring a claim of wrongful discharge. (Doc. 1 at 6.) Even assuming Williams was constructively discharged (since he was allegedly given the choice to retire or be fired), Williams has not plausibly shown that he was discharged "because of" his race, sex, or age. 42 U.S.C. § 2000e-2(a)(1); U.S.C. § 623(a)(1).

Williams' main support is the final incident prior to his departure from GTCC. Williams responded to a call, along with two other officers, Sergeant Raymond Reese (an African American man in his fifties) and Officer Ron Johnson (a white man also in his fifties). (Doc. 1 at 6.) For reasons not given in the complaint, Chief Tevepaugh questioned the way the three men responded to the call and began an investigation into their response that ultimately led to Williams being forced into retirement. (Id.) Williams alleges that the other two men were "not discharged as I was." (Id.) It is unclear whether any action less than discharge was taken against them.

Since both of the other officers being investigated were men, Williams has not pleaded a plausible claim of sex-based discharge. And since Sergeant Reese was African American like Williams, and Williams has not alleged any other basis for finding race as a motive in his firing, there is no plausible claim for race-based discharge. Finally, the other officers are approximately ten years

19

younger than Williams and themselves within the protected class
(being over forty years old, see 29 U.S.C. § 631(a)), and nothing
surrounding this incident, or any other incident, plausibly shows
that Chief Tevepaugh had animus toward Williams based on his age.[4]
Even taken in the light of all the other allegations made in the
complaint, Williams has failed to show that his discharge was based
on an improper motive. As in McCleary-Evans, "[o]nly speculation
can fill the gaps." 780 F.3d at 586. Williams does not allege
any information concerning the event that led to final
investigation and discharge. He neither explains what reason was
given for his discharge, nor what role the other two officers
played in the incident leading to his discharge. Williams does
not even deny the merits of the investigation. Without such
details, Williams cannot nudge his claims of invidious
discrimination across the line from conceivable to plausible. Id.
at 587.

It is unclear whether Williams believes he has stated other
claims for discrimination. His briefing is unresponsive, failing
to explain how many counts of discrimination he means to bring and
which parts of his free-flowing narrative match up to which claims.
Although the court has construed Williams' claims liberally, it

---

[4]    The incident with Corporal Clodfelter asking Williams about his
retirement, as analyzed above, also fails to show that Chief Tevepaugh
acted with animus toward Williams based on his age. Williams has failed
to allege enough facts surrounding the incident to make such animus
plausible in support of any claim.

cannot be his "advocate." <u>United States v. Wilson</u>, 699 F.3d 789, 797 (4th Cir. 2012). Therefore, the court concludes that Williams' complaint fails to state claims for wrongful discharge. Because the defects in this claim might result from pleading deficiencies, the dismissal will be without prejudice to the claim being re-filed if sufficient facts exist to support it.

### c. Retaliation

Williams makes little effort to set out which of GTCC's actions were retaliatory, alleging merely that he has been "harassed, suspended, discharged and ultimately forced to retire" in retaliation "for advising [GTCC] that [he] was going to file a complaint of discrimination and for filing the charge of discrimination with the EEOC against my employer." (Doc. 1 at 5.) Construing his complaint liberally, the court will consider all adverse actions plausibly occurring after he first indicated he would send correspondence to the EEOC, which appears to be just before October 5, 2013. (Doc. 1 at 4-5.)

Under both Title VII and the ADEA, an employer shall not "discriminate against any of his employees because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." 42 U.S.C. § 2000e-3(a); <u>see also</u> 29 U.S.C. § 623(d) ("It shall be unlawful for an employer to discriminate against any of his employees . . . because such individual . . . has made a charge, testified,

21

assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter."). The elements of a prima facie retaliation claim are "(1) engagement in a protected activity; (2) adverse employment action; and (3) a causal link between the protected activity and the employment action." Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010) (affirming dismissal of complaint), aff'd sub nom. Coleman v. Court of Appeals of Md., 132 S. Ct. 1327 (2012).

The adverse employment action must be one that a reasonable employee would have found materially adverse, which, in this case, means that it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (internal quotation marks omitted) (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). To make out a causal link, there ordinarily must "be some degree of temporal proximity" between the protected activity and the retaliatory conduct. Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 501 (4th Cir. 2005).

Williams' retaliation claim borders on being tenuous, but, construing his allegations liberally due to his *pro se* status, the court will permit the claim to go forward. Secretive surveillance and heightened scrutiny of an employee can constitute adverse employment actions for retaliation purposes. See, e.g., MacDonald

v. United Parcel Serv., 430 F. App'x 453, 465–66 (6th Cir. 2011)
(holding that surveillance of an employee by hidden cameras as
form of heightened scrutiny can support retaliation claim); Rios
v. Municipality of Guaynabo, 938 F. Supp. 2d 235, 244 (D.P.R. 2013)
("[C]ourts have recognized that placing an employee under constant
surveillance could be evidence of retaliation." (quoting Montalvo
Rios v. Municipality of Guaynabo, No. CIV. 10-1293 SEC, 2011 WL
1258618, at *7 (D.P.R. Mar. 24, 2011)); Mendez v. Starwood Hotels
& Resorts Worldwide, Inc., 746 F. Supp. 2d 575, 598 (S.D.N.Y. 2010)
("[T]here is nothing unreasonable about the jury's concluding that
secret surveillance by an employer well might . . . dissuade a
reasonable employee from continuing to complain about
discrimination . . . .").  In finding such conduct plausibly
retaliatory, the court draws several inferences in Williams'
favor.

First, the court infers that Williams was being secretly
recorded after he gave notice, around October 5, 2013, that he was
going to file an EEOC charge.  Williams' surveillance allegation
comes at the end of his narrative, after he explains that he was
"forced to retire."  (Doc. 1 at 6.)  Its temporal proximity is
therefore somewhat ambiguous.

Second, the court also infers that GTCC informed Williams, at
some point, that he was being watched.  Although Williams claims
the video camera was "hidden," he clearly became aware of it at

23

some point because he included the allegation in the complaint. Without such an inference being true, it is unclear how a reasonable person would have been dissuaded from pursuing an EEOC charge by conduct of which he was unaware. It would also be unclear why GTCC undertook secret surveillance with the intent to dissuade Williams from filing an EEOC charge unless it eventually told him that he was being watched.

Williams may be facing other problems eventually, given that it appears he was being investigated by GTCC before he threatened to file an EEOC charge. "Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." Francis v. Booz, Allen & Hamilton, Inc., 452 F.3d 299, 309 (4th Cir. 2006) (affirming summary judgment and quoting Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001)). That Williams may be facing an uphill battle because, like in Francis, gradual adverse actions had possibly already been taken against him before he contacted the EEOC, however, does not render his claim implausible as a matter of law.

Therefore, because these allegations are sufficient to render Williams' retaliation claim plausible, Defendants' motion to dismiss that claim under Title VII and the ADEA will be denied. Whether Williams can prove such claim remains for another day.

24

## III. CONCLUSION

For the reasons stated, therefore,

IT IS ORDERED that Defendants' motion to dismiss (Doc. 20) be GRANTED IN PART AND DENIED IN PART as follows:

1.  Williams' claims against all Individual Defendants except Parker are DISMISSED WITH PREJUDICE;

2.  Williams' claims against Parker in his individual capacity are DISMISSED WITH PREJUDICE;

3.  Williams' claims against the GTCC Board of Trustees are DISMISSED WITHOUT PREJUDICE for insufficient service of process;

4.  Williams' claims for punitive damages are DISMISSED WITH PREJUDICE;

5.  Williams' claims for hostile work environment are DISMISSED WITH PREJUDICE;

6.  Williams' claims for wrongful discharge are DISMISSED WITHOUT PREJUDICE; and

7.  Williams' claims for retaliation under Title VII and the ADEA are permitted to proceed at this stage.

IT IS FURTHER ORDERED that this court's earlier stay of discovery (Doc. 31) is LIFTED.

                                    /s/    Thomas D. Schroeder
                                    United States District Judge

July 13, 2015

25